## REDACTED OPINION

# In the United States Court of Federal Claims

**No. 16-1536C**
**Filed: May 30, 2017**
**Redacted Version Issued for Publication: July 10, 2017[1]**

* * * * * * * * * * * * * * * *

| | |
|---|---|
| **UNITEDHEALTH MILITARY &** | * |
| **VETERANS SERVICES, LLC,** | * |
| | * |
| **Protestor,** | * |
| | * |
| **v.** | * |
| | * |
| **UNITED STATES,** | * |
| | * |
| **Defendant,** | *   **Post-Award Bid Protest; Cross** |
| | *   **Motions for Judgment on the** |
| **v.** | *   **Administrative Record; Price** |
| | *   **Realism.** |
| **HEALTH NET FEDERAL SERVICES,** | * |
| **LLC,** | * |
| | * |
| **Defendant-Intervenor,** | * |
| | * |
| **v.** | * |
| | * |
| **HUMANA GOVERNMENT** | * |
| **BUSINESS, INC.,** | * |
| | * |
| **Defendant-Intervenor.** | * |

* * * * * * * * * * * * * * * *

**Jason A. Carey**, Covington & Burling LLP, Washington, D.C., for protestor. With him were **Alan A. Pemberton**, **Jennifer L. Plitsch**, **Scott A. Freling**, **Jason N. Workmaster**, **John W. Sorrenti**, **Alexander B. Hastings**, **Bryan M. Byrd**, and **Kassandra D. Maldonado**, Covington & Burling LLP, Washington, D.C.

**William P. Rayel**, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Chad A. Readler**, Acting Assistant Attorney General, Civil Division, Department of Justice. Of counsel were **Rhonda L. Bershok** and **Michael E. Jonasson**, Office of General Counsel, Defense Health Agency.

---

[1] This opinion was issued under seal on May 30, 2017. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with the redactions that the parties proposed in response to the court's request. Words and numbers which are redacted are reflected with the notation: "[Redacted]."

**Thomas P. Humphrey**, Crowell & Moring LLP, Washington, D.C. for defendant-intervenor Health Net Federal Services, LLC.  With him were **John E. McCarthy Jr.**, **Mark A. Ries**, **James G. Peyster**, **Jacinta L. Alves**, **Robert J. Sneckenberg**, and **Hart W. Wood**, Crowell & Moring LLP, Washington, D.C.


**Paul R. Hurst**, Steptoe & Johnson, LLP, Washington, D.C. for defendant-intervenor Humana Government Business, Inc.  With him were **Peter L. Wellington**, **Thomas P. Barletta**, **Sharon L. Larkin**, **Michael N. Navarre**, **Raquel N. Parker**, **Nicholas Petts**, and **Rebecca A. Lipe**, Steptoe & Johnson LLP, Washington, D.C. Also with him was **Daniel P. Graham**, Vinson & Elkins LLP, Washington, D.C.

## O P I N I O N

### HORN, J.

The protestor, UnitedHealth Military & Veterans Services, LLC (M&V), filed a post-award bid protest in this court challenging the decision of defendant, the United States, through the United States Department of Defense, Defense Health Agency (DHA), to award two Managed Care Support (MCS) contracts for health, medical, and administrative support services for TRICARE-eligible beneficiaries to defendant-intervenors, Humana Government Business, Inc. (Humana) and Health Net Federal Services, LLC (Health Net). Protestor filed suit in the United States Court of Federal Claims after the United States Government Accountability Office (GAO) issued a decision denying M&V's protest. See generally UnitedHealth Military & Veterans Servs., LLC, et al., B-411837.2 et al., 2016 WL 6821970 (Comp. Gen. Nov. 9, 2016).

### TRICARE Program Background

This bid protest challenges the award of the "T-2017" procurement for MCS services for the United States Department of Defense TRICARE program, which is the United States Department of Defense's managed healthcare program for service members, retirees, and their families and survivors.[2] The total non-overseas population of TRICARE-eligible beneficiaries in the United States was estimated by DHA in its acquisition strategy memorandum as approximately 9.2 million. Under the TRICARE program, the Department of Defense provides healthcare through military treatment facilities (MTFs) or reimburses private sector healthcare providers for healthcare services provided to eligible beneficiaries. The DHA is responsible for operating the TRICARE

---

[2] The statute at 10 U.S.C. § 1072(7) (2012) defines the "TRICARE program" as the managed healthcare program that is established by the Department of Defense under the authority of Title 10 Chapter 55 of the United States Code. Pursuant to regulation, the TRICARE program is established for the purpose of implementing a comprehensive managed healthcare program for the delivery and financing of healthcare services in the military health system. See 32 C.F.R. § 199.17(a) (2017).

program.[3]

Because the military's direct healthcare system does not fully satisfy the military's healthcare needs, the Department of Defense awards contracts to MCS contractors to support the military health system and to optimize the delivery of healthcare services to all TRICARE-eligible beneficiaries. MCS contract services include:

> [E]stablishing civilian provider networks in designated geographic areas that meet statutorily-defined access standards for TRICARE Prime enrollees; providing comprehensive health care services to Prime enrollees whose primary care managers are TRICARE network providers and to users of TRICARE Extra and Standard; assisting military treatment facility . . . Commanders in optimizing healthcare delivery in the direct care system, providing referrals for specialty services to an MTF provider prior to a civilian provider; enrolling beneficiaries in PRIME; paying healthcare claims for private sector medical services rendered to TRICARE eligibles; providing customer service and beneficiary/provider education activities for all TRICARE eligibles; and disease management.

As the acquisition strategy for the "T-2017" procurement explained, "[t]his acquisition is to purchase administrative and support services for the receipt of health care from the private sector and for the integration of that private sector care with the DoD [Department of Defense] direct care system."

The "T-2017" procurement follows the current TRICARE contracts, referred to as TRICARE Third Generation, or "T-3" contracts, and the "T-2017" procurement represents the fourth generation of such MCS contracts since 1996. The "T-3" contracts have been held by three separate MCS contractors, each responsible for one region of the country: North, South, or West. Humana, Health Net, and M&V are the current TRICARE incumbent contractors performing the "T-3" contracts. Health Net holds the "T-3" contract for the North Region, Humana holds the "T-3" contract for the South Region, and M&V holds the "T-3" contract for the West Region. Distinct from the earlier "T-3" contracts, and as discussed further below, the "T-2017" procurement, at issue in this bid protest, divided the country into two regions, East and West.[4] The "T-2017" procurement contemplated that DHA would award two "T-2017" contracts, one for the East Region and one for the West Region.

---

[3] Under the TRICARE program, beneficiaries elect one of three options: TRICARE Prime, TRICARE Extra, or TRICARE Standard.

[4] The Source Selection Plan for the "T-2017" procurement explains that DHA intends to award only two regional contracts in order to "achieve financial and administrative efficiencies and to keep MCS contracts synchronous."

The "T-2017" Solicitation

To initiate the "T-2017" procurement, DHA issued Request for Proposals No. HT9402-15-R-0002 (the solicitation) on April 24, 2015, seeking two MCS contractors to "assist the Military Health System (MHS) in operating an integrated healthcare delivery system combining resources of the military's direct medical care system and the Contractor's managed care support to provide health, medical and administrative support services to TRICARE-eligible beneficiaries."[5] Under the "T-2017" contracts, the contractors would be required to perform the services necessary to support the TRICARE program, including establishing and maintaining provider networks, managing referrals between the military treatment facilities and the civilian network, managing beneficiary enrollment, providing medical management services, providing readily accessible customer service, and processing claims. Section C of the solicitation set forth four contract objectives: readiness, experience of care, manage per capita cost, and population health.

According to the solicitation, DHA intended to conduct a best value source selection and award two contracts, "consisting primarily of cost-plus fixed-fee types, with fixed-price elements, cost reimbursable elements and performance incentive fees. . . ." DHA intended to select the best overall offer for the East and West Regions, "based upon an integrated assessment of technical/management, past performance, and price/cost factors."[6] The solicitation stated that DHA would "conduct a full and open competition after exclusion of sources in this solicitation to foster an adequate number of viable Contractors to reduce any risk to the stability of the administration of the TRICARE program, and to ensure the continuous availability of healthcare services for TRICARE beneficiaries." The East Region Contract was to cover approximately 5.9 million TRICARE-eligible beneficiaries, and the West Region Contract was to cover approximately 2.9 million TRICARE-eligible beneficiaries.[7] The solicitation explained that DHA would select two

---

[5] According to the acquisition strategy document included in the administrative record, prior to issuing the solicitation, "DHA conducted market research via requests for information (RFIs), an Industry Forum, and health care industry subject matter experts."

[6] Pursuant to 10 U.S.C. § 1073a(a) (2012), healthcare contracts must be awarded on a best value basis "to the maximum extent consistent with furnishing high-quality health care in a manner that protects the fiscal and other interests of the United States."

[7] The East Region Contract was to include Alabama, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Indiana, Iowa (Rock Island Arsenal Area only), Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri (St. Louis area only), New Hampshire, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas (excluding Western Texas), Vermont, Virginia, West Virginia, and Wisconsin. The West Region Contract was to include Alaska, Arizona, California, Colorado, Hawaii, Idaho, Iowa (except the Rock Island Arsenal area), Kansas, Minnesota, Missouri (except the St. Louis area), Montana, Nebraska, Nevada, New Mexico, North Dakota, Oregon, South Dakota,

different prime contractors "even if a potential Contractor submits proposals for more than one contract region and each of the proposals is evaluated as the best value for the Government for the contract region of submission." Although DHA intended to award two contracts to two different prime contractors, offerors were permitted to submit proposals on one or both regions. According to the solicitation, if an offeror was determined to have submitted best value proposals for both the East and West Regions, "the Offeror will be awarded the East Region contract, provided at least one other acceptable offer" was submitted for the West Region contract. The West Region contract would then go to the next best value proposal for the West Region. The "T-2017" contracts would consist of a base period of at least nine months, five one-year options periods, and a transition-out period.

Relevant to this bid protest, the solicitation identified Contract Line Items (CLINs) for the work to be performed. CLINs X001 covered the reimbursable "Underwritten Healthcare Cost" for TRICARE Prime enrollees, non-Prime underwritten beneficiaries, and military treatment facility enrollees. As explained in Section H of the solicitation, contractors would be required to underwrite the cost of civilian healthcare services, and Section H detailed special contract requirements regarding the contractors' financial underwriting of those healthcare costs.[8] According to Section H, the contractors would be responsible for paying network provider claims for services rendered up to a Maximum Allowable Charge rate established by regulation.[9] The solicitation explained that the underwritten healthcare costs paid by the contractors would be cost-reimbursable. The solicitation provided offerors with DHA's estimated, underwritten healthcare costs for the base year and for each option period for each region, and offerors were instructed to use the DHA's estimates in their proposals. The solicitation directed that an offeror "shall <u>not</u> propose its own estimated healthcare costs, but use those supplied by the Government." (emphasis in original).

To account for the risks associated with financially underwriting healthcare costs, the solicitation directed offerors to propose an "Underwritten Healthcare Fixed Fee," or "underwriting premium." This fixed fee for each option period was identified in CLINs X002. The solicitation provided that this fixed fee would not be "subject to change after contract award." The solicitation also stated that the fixed fee would "not be subject to change as a result of changes to administrative efforts during contract performance," nor would it "be subject to change for increases or decreases in healthcare cost estimates because of change orders issued during contract performance."

---

Texas (only Western Texas), Utah, Washington, and Wyoming.

[8] By statute, contractors are required to financially underwrite the delivery of healthcare services under the TRICARE program. <u>See</u> 10 U.S.C. § 1072(7).

[9] The solicitation included a list of non-underwritten categories that were excluded from the requirement.

Section H of the solicitation also included the healthcare underwriting incentives for the MCS contractors. This section explained that the contractors "may earn an underwriting incentive by either exceeding a minimum standard, or for performance above a fully satisfactory level in areas that reduce healthcare cost and are measurable. . . ." In order to reduce the underwritten healthcare costs reimbursed by DHA (CLINs X001), the solicitation included a Network Discount Incentive and encouraged offerors to "proactively negotiate discounts with network providers." By negotiating discount rates for healthcare services with network providers, the solicitation allowed offerors to propose a Guaranteed Network Provider discount for the base year and each option period of the contract, and explained that the contractor would be eligible to receive a financial incentive if the discount was exceeded during the life of the contract. These negotiated discount rates would lower the amount of underwritten healthcare costs that DHA would be required to reimburse the contractors under the terms of the contracts awarded. Offerors were to propose Guaranteed Network Provider discounts as percentage figures, not as fixed dollar amounts. In considering the proposals, the plug-in dollar amount that DHA had provided for CLINs X001 would be reduced by the percentage discount proposed by each offeror. According to the solicitation, "[t]he application of the Offeror's guaranteed network provider discounts will be the only adjustments to the CLINs X001." The solicitation explained that the Guaranteed Network Provider discount would be measured as an overall discount for care by civilian network providers, and that "[t]he difference between the Government's estimate of Underwritten Healthcare Costs and the Offeror's proposed discount amount is its proposed CLIN X001 Underwritten Healthcare Costs." Therefore, each offeror's Guaranteed Network Provider discount had the effect of reducing CLINs X001 for underwritten healthcare costs in their proposals, and, thus, reducing the total evaluated prices of the proposals.

According to the solicitation, during contract performance, the achieved Guaranteed Network Provider discount would be calculated based on the overall average value of the actual discounts from TRICARE allowable charges. At the end of each option period, DHA would calculate the achieved dollar amount of the network discount by comparing the proposed Guaranteed Network Provider discount and what the TRICARE reimbursement methodology would have allowed in the absence of the negotiated discount rate. If the calculated average percentage discount for an option period is less than or equal to the proposed Guaranteed Network Provider discount, DHA would offset any dollar deficit from the next payment due to the contractor. If the calculated average percentage discount for an option period is greater than the proposed Guaranteed Network Provider discount, then DHA would pay an incentive amount to the contractor.

Under the terms of the solicitation, the offerors assumed full financial risk for their proposed Guaranteed Network Provider discounts. The solicitation stated, in pertinent part:

> **H.2.3.1.1.4.** These guaranteed discounts shall not be adjusted for changes to TRICARE allowable amounts, the expansion of TRICARE coverage to additional procedures and Durable Medical Equipment (DME); or any other

actions and conditions that may affect providers' willingness to accept discounts. The Contractor fully understands the risks in financially underwriting the delivery of healthcare services under this contract, and assumes all risks of future conditions and changes that may affect the Contractor's ability to achieve the guaranteed discounts.

(emphasis in original). The solicitation did not require offerors to submit supporting data or information as to the offerors' approach to calculating the proposed Guaranteed Network Provider discounts.

Also relevant to this bid protest, the solicitation included CLINs X003, which were fixed-price CLINs for administration services costs for the base year and each option year of the contract, including the costs for managing and administering the underwritten healthcare costs. The solicitation instructed offerors to propose a per member, per month (PMPM) unit price for CLINs X003 that accounted for all "program administration costs," including "all effort necessary to perform all contract requirements unless otherwise priced in another CLIN."

The solicitation included, as Attachment L-7, the government estimate for "member months" for each option period and for each region. The value of CLINs X003 would be determined by multiplying the proposed PMPM unit prices by DHA's estimated number of member months for each option period and region. The solicitation explained that, during contract performance, for each option year, DHA would "unilaterally determine" the number of eligible TRICARE beneficiaries twice, once during the first six months, and again for months seven through twelve. Using the number of eligible beneficiaries, DHA would calculate the "member months" for the sixth-month period by multiplying the number of eligible beneficiaries by the number of months (six). After determining the member months for each six-month period, DHA would multiply the number of member months by the offeror's fixed PMPM price to determine the CLIN X003 amount for the option period. The other CLINs in the solicitation also included CLIN 0001 for the contractors' transition-in effort, for which offerors were instructed to propose a firm fixed-price, and CLIN 9001 for the contractors' transition-out efforts, for which offerors were instructed to propose a cost plus fixed fee.[10]

Section L of the solicitation included proposal preparation instructions. Offerors were cautioned to follow the instructions provided in Section L and notified that proposals that take exception to the inclusion of specific requirements in the contract would not be considered. Similarly, offerors were instructed that non-conformance with the solicitation requirements could result in an unfavorable proposal evaluation or a rejection of the proposal. Pursuant to Section L of the solicitation, offerors were required to provide proposals comprised of five volumes for each region it chose to submit an offer. These volumes were to include an executed proposal, a technical proposal, information on past performance, a price/cost proposal, and a volume on financial data. Offerors were

---

[10] CLIN 9002 accounted for the fixed fee associated with the contractor's transition-out efforts. The solicitation also included CLINs X004, X005, X006, and X007.

directed to submit technical proposals "which effectively demonstrate[d] the Offeror's understanding of the requirements, and provide[d] a successful technical solution for the prospective contract." Section L instructed that the "price/cost proposal, past performance information, and financial information shall not be addressed in the technical proposal volume, and no part of the technical proposal shall incorporate by reference portions of other volumes of the proposal." Section L of the solicitation directed that the offerors' technical proposals should not address the proposed Guaranteed Network Provider discounts, and that the discounts should only be addressed in the price proposals. Further, the solicitation stated "[t]he Offeror's proposed guaranteed network provider discount percentages, the calculated discount dollar amounts, and the resulting proposed Underwritten Healthcare Costs shall be clearly identified" in the price proposal.

Section M of the solicitation set forth the evaluation criteria that DHA would employ to determine which proposal represented the best value to the agency for the East and West region contracts. Of particular relevance to this post-award bid protest, the solicitation explained:

> **M.2.2. Unrealistic Proposals.** The Government may reject any proposal that is evaluated to be unrealistic in terms of program commitments, contract terms and conditions such that the proposal is deemed to reflect an inherent lack of competence or failure to comprehend the complexity and risks of the program.
>
> **M.2.3. Evaluation Approach**. The Government will evaluate the extent to which the proposal exhibits a clear understanding of the work requirements and the means required to fulfill the requirements. The Government will also evaluate the extent to which the proposal demonstrates an ability to meet or exceed the requirements defined in the Request for Proposal (RFP) and the quality of service which is likely to result from implementation of an Offeror's proposed methods.

(emphasis in original). In the section that followed, Section M.3., the solicitation set forth the evaluation factors and subfactors:

> **Factor 1-Technical/Management**
> > Subfactor 1-Network Management
> > Subfactor 2-Referral Management
> > Subfactor 3-Medical Management
> > Subfactor 4-Customer Service
> > Subfactor 5-Claims Processing
> > Subfactor 6-Program Planning and Control
> > Subfactor 7-Transition Management
> **Factor 2-Past Performance**
> **Factor 3-Price/Cost**
> **Factor 4-Small Business Participation Factor**

(emphasis in original). For Factor 1, Technical Management, Subfactor 1, Network

8

Management, among other criteria, DHA intended to evaluate whether the offerors' network sizing model effectively considered the number of providers required, types of providers required, Military Treatment Facility capacity, and the beneficiary population. The solicitation required the contractors to "establish and maintain networks of individual and institutional providers for TRICARE Prime and Extra which produce the best quality clinical outcomes for TRICARE beneficiaries" and are "sufficient in number, mix, and geographic distribution to provide the full scope of benefits for which all Prime enrollees are eligible." The provider networks also were required to satisfy certain access standards in Prime Service Areas for TRICARE Prime enrollees.

As to Subfactor 2, Referral Management, DHA would evaluate the effectiveness of the offerors' proposals for managing referrals between MTFs and the civilian network. Under Subfactor 3, Medical Management, DHA would evaluate the offerors' proposed approach "for designing, implementing, and maintaining integrated, comprehensive medical management programs for all care received by TRICARE-eligible beneficiaries in the civilian sector and for complementing medical management services available within the MTF." As to Subfactor 4, Customer Service, DHA would evaluate the offerors' proposed approaches to customer service to determine how well they provide "accurate, comprehensive customer information with knowledgeable, courteous, and responsive staff." Under Subfactor 5, Claims Processing, DHA would evaluate the offerors' proposals for the "inclusion of a readily adaptable, scalable claims processing system[s] which incorporat[e] industry best practices." Regarding Subfactor 6, Program Planning and Control, DHA would evaluate the extent to which the offerors' proposals demonstrate "an effective management approach for establishing and maintaining, throughout the life of the contract, qualified, experienced key personnel." Under Subfactor 7, Transition Management, DHA would evaluate the proposals for an "effective Integrated Master Schedule and Integrated Master Plan (IMP/IMS) which meets or exceeds the Government transition requirements."

The solicitation explained that, for Factor 1, each subfactor would receive a Technical/Management rating and a proposal risk rating. These ratings were not consolidated into an overall factor rating. As to the technical rating, DHA would evaluate the quality of the offeror's technical solution "for meeting the Government's requirement." The technical rating would be expressed as a color rating, either Blue/Outstanding, Purple/Good, Green/Acceptable, Yellow/Marginal, or Red/Unacceptable, as depicted in the following table:

| TABLE M.5.1. – TECHNICAL RATINGS | | |
|---|---|---|
| **Color** | **Rating** | **Description** |
| Blue | Outstanding | Proposal meets requirements and indicates an exceptional approach and understanding of the requirements.  The proposal contains multiple strengths and no deficiencies. |
| Purple | Good | Proposal meets requirements and indicates a thorough approach and understanding of the requirements.  Proposal contains at least one strength and no deficiencies. |
| Green | Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements.  Proposal has no strengths or deficiencies. |
| Yellow | Marginal | Proposal does not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements. |
| Red | Unacceptable | Proposal does not meet requirements and contains one or more deficiencies and is unawardable. |

With respect to the proposal risk rating for the subfactors, the solicitation stated that "[t]he Government will assess the degree to which the proposed approach has the potential for disruption of schedule, increased costs, degradation of performance, the need for increased Government oversight, and the likelihood of unsuccessful contract performance." The proposal risk ratings were Low, Moderate, and High, as depicted in the following table:

| TABLE M.6.2. - TECHNICAL/MANAGEMENT RISK RATINGS | |
|---|---|
| **Rating** | **Description** |
| Low | Has little potential to cause disruption of schedule, increased cost or degradation of performance. Normal contractor effort and normal Government monitoring will likely be able to overcome any difficulties. |
| Moderate | Can potentially cause disruption of schedule, increased cost or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome difficulties. |
| High | Is likely to cause significant disruption of schedule, increased cost or degradation of performance.  Is unlikely to overcome any difficulties even with special contractor emphasis and close Government monitoring |

With regard to Factor 2, Past Performance, offerors were required to submit information for the five largest contracts performed by the offeror, or by their first tier subcontractors, that were ongoing or had concluded within the three years prior to the date on which the solicitation was issued. DHA would assign a "performance confidence assessment rating relative to the Offeror's ability to successfully perform the requirements of this solicitation," as defined in the following table:

| TABLE M.8.5.2. - PERFORMANCE CONFIDENCE ASSESSMENTS | |
| --- | --- |
| **Rating** | **Description** |
| SUBSTANTIAL CONFIDENCE | Based on the Offeror's performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |
| SATISFACTORY CONFIDENCE | Based on the Offeror's performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
| LIMITED CONFIDENCE | Based on the Offeror's performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |
| NO CONFIDENCE | Based on the Offeror's performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort. |
| UNKNOWN CONFIDENCE | No performance record is available or the Offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. |

As to Factor 3, Price/Cost, under Section M.9.6., the solicitation provided that "[t]he Government will evaluate the Offeror's TEP [total evaluated price] for reasonableness. Line items will also be reviewed for unbalanced pricing." Section M.9.2. of the solicitation explained that DHA would evaluate Factor 3, Price/Cost, based upon DHA's calculated total price for each proposal, which is the sum of the "extended amounts" for the base and all five option periods for "CLIN 0001 Transition-In, CLIN X001 Underwritten Healthcare Cost, CLIN X002 Underwritten Healthcare Cost Fixed Fee, SLIN X003AA and SLIN X003AB Per Member Per Month (PMPM), CLIN X005 Service Assist Teams, CLINs 9001/9002 Transition-Out . . . and the calculated amount for the extension of services." Section M.9.4. explained that DHA would evaluate the underwritten healthcare costs, as follows:

### M.9.4.1.   CLIN   X001 Underwritten   Healthcare   Costs/CLIN   X002 Underwriting Fixed Fee:

The Government has provided the reimbursable cost estimates for underwritten healthcare costs. The application of the Offeror's guaranteed network provider discounts will be the only adjustments to the CLINs X001. The Government will make the adjustments to all offers according to the Price Evaluation Template, tab entitled Healthcare Cost & Discount. The

Offeror's proposed underwriting fixed fee will not be subject to a most probable cost evaluation. It will be included as proposed in the Total Evaluated Price.

(emphasis in original).

Offerors were instructed to use the Price Evaluation Templates attached to the solicitation to present their proposed costs and prices. The solicitation included separate Price Evaluation Templates for the East Region and for the West Region. The Price Evaluation Templates were formulated to include DHA's estimates with regard to Underwritten Healthcare Costs and the "Per Member Per Month (PMPM) eligible quantities for the two regions," which offerors were to use as plug-in numbers. Offerors also were instructed to list their proposed staffing/man-loading in the Price Evaluation Templates as well as the number of Full Time Equivalents (FTEs) for each labor category and a breakdown of the FTEs by functional area. The solicitation stated that "the FTEs should reflect the Offeror's proposed man-loading." According to the Source Selection Plan, due to the complexities associated with the PMPM CLINs and the anticipated proposed Guaranteed Network Provider discount provisions, the solicitation also required that "'Data Other than Certified Cost or Pricing Data' shall be submitted by the Offeror to support the price reasonableness of its proposal," and offerors were directed to include in their proposal a "Price/Cost Proposal Narrative" discussing their proposed PMPM prices and transition prices. At the conclusion of Section L was a "<u>Cost Note</u>" that stated: "The Government reserves the right to request additional information in support of any proposed cost, as required for a reasonableness determination." (emphasis in original).

Factor 1 (Technical/Management) and Factor 2 (Past Performance) were of equal weight and, individually, were each more important than Factor 3 (Price/Cost). When combined, Factors 1 and 2 were significantly more important than Factor 3, Price/Cost. Factor 4 (Small Business Participation) was evaluated on an acceptable/non-acceptable basis. With regard to the technical subfactors, Subfactor 6 (Program Planning and Control) was the most important. Subfactor 7 was less important than Subfactor 6, but more important than Subfactors 1, 2, 3, 4, and 5 individually. Subfactors 1 through 5 were weighted equally.

Prior to issuing the solicitation, DHA conducted market research and developed an Independent Cost Estimate (ICE). DHA hired an outside consultant to develop the ICE, which was determined to be $45,697,536,533.00 for the East Region contract and $19,902,918,734.99 for the West Region contract. The ICE estimated an average PMPM price of $8.81 in the East Region and $9.89 in the West Region. The ICE estimated further that performance of the services in Option Period 1 would require 2,085 Full Time Equivalents in the West Region and 4,013 Full Time Equivalents in the East Region.

The solicitation was issued on April 24, 2015. Subsequently, DHA issued seven amendments and received 250 questions from potential offerors prior to the proposal deadline. During the pre-proposal question-and-answer period, M&V submitted the following inquiry:

The RFP does not require submission of Certified Cost or Pricing Data, but does require submission of data other than Certified Cost or Pricing Data. The RFP further indicates that the Government will evaluate an offeror's Total Evaluated Price (TEP) for reasonableness and the FAR [Federal Acquisition Regulation] indicates that price analysis shall be used when Certified Cost or Pricing Data are not required. Price analysis is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit. Section L appears to require offerors to submit data and information that is required for a price realism analysis, but not a price reasonableness analysis. Will the government clarify its price evaluation methodology and amend the RFP to remove from section L.8 the need for offerors to submit schedules, templates, narratives, and other documentation regarding the individual cost element components of the offered price for CLINs where the Government will evaluate the offeror's price based on a price reasonableness analysis?[11]

In response to the question, DHA stated: "The solicitation requirements remain the same, calling for the submission of Data Other Than Certified Cost or Pricing Data."

Four offerors submitted proposals for the East Region contract, including M&V, Humana, Health Net, and WellPoint Military Care Corporation (Wellpoint).[12] Three offerors submitted proposals for the West Region contract, including M&V, Humana, and Health Net. After receiving the proposals, DHA conducted initial evaluations and, subsequently, established a competitive range and engaged in in-person discussions with the offerors. Offerors submitted final proposal revisions on February 16, 2016.

The proposals submitted in response to the solicitation were evaluated by a source selection team that included a Source Selection Evaluation Board, a Source Selection Advisory Council, and a Source Selection Authority. The Source Selection Evaluation Board consisted of three independent evaluation teams, the Technical Evaluation Team (TET), a Past Performance Evaluation Team (PPET), and a Price/Cost Team (P/CT).[13] The TET was divided into four sub-teams, with each team addressing one or two subfactors based on the subject matter expertise of its members. The first TET sub-team evaluated network management and referral management, the second TET sub-team evaluated medical management, the third TET sub-team evaluated customer service and claims processing, and the fourth TET sub-team evaluated program planning and control

---

[11] Section L of the solicitation required that "'Data Other than Certified Cost or Pricing Data' shall be submitted by the Offeror to support the price reasonableness of its proposal."

[12] WellPoint intervened in the GAO protest, but is not a party in the above-captioned bid protest.

[13] According to the SSA's source selection documentation, the contracting officer evaluated Factor 4, Small Business Participation.

and transition management. The offerors' final proposal revisions were evaluated by the sub-teams within the TET, the other members of the Source Selection Evaluation Board, and the Source Selection Advisory Council.

The Source Selection Evaluation Board's evaluation findings were contained in two Source Selection Evaluation Board consensus reports, one for the East and West Regions. In the reports, the Chairperson of the Source Selection Evaluation Board summarized the evaluation findings of the TET, the PPET, and the P/CT. The proposals and the evaluation record were then reviewed by the Source Selection Authority, who prepared two Source Selection decision documents, to support the award decisions for the East and West Region contracts. The Source Selection Authority decision documents for both the East Region and West Region contract awards, which were 242 pages and 176 pages in length, respectively, demonstrated a lengthy and carefully considered evaluation process.

East Region Evaluation

The following table represents the offerors' final proposed prices for the East Region contract in comparison to the ICE:

| EAST Region: | Total Evaluated Price | Percent Difference from ICE |
|---|---|---|
| Health Net | $40,170,839,651.00 | -12.1% |
| Humana | $40,517,947,263.00 | -11.3% |
| WellPoint Medical | $40,712,000,000.00 | -10.9% |
| M&V | $43,073,480,195.00 | -5.7% |
|  |  |  |
| ICE: | $45,697,536,533.00 |  |

The total evaluated prices, as depicted above, were affected in large part by the offerors' proposed Guaranteed Network Provider discounts (CLINs X001), as well as the proposed PMPM administrative costs (CLINs X003). Regarding CLINs X001 for underwritten healthcare costs, the following chart shows the Guaranteed Network Provider discounts that each offeror proposed and the projected impact on the total underwritten healthcare costs for each option period:

| EAST Region | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| Government-provided estimate underwritten healthcare costs (UHCC) | $6,705,544,670 | $6,705,544,670 | $6,705,544,670 | $6,705,544,670 | $6,705,544,670 |
| Health Net Proposed Discount | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| Health Net proposed UHCC | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| Humana Proposed Discount | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| Humana Proposed UHCC | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| M&V Proposed Discount | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| M&V Proposed UHCC | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| WellPoint Med. Proposed Discount | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| WellPoint Med. Proposed UHCC | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |

In addition to the proposed Guaranteed Network Provider discounts depicted in the table above, offerors also proposed a fixed fee for the underwritten healthcare costs, contained in CLINs X002. The following table captures the offerors' proposed fixed fee as compared to the ICE fixed fee:

| EAST Region | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| ICE Fixed Fee | $100,583,170 | $105,762,695 | $111,557,489 | $117,394,756 | $123,486,733 |
| Health Net Fixed Fee | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| Humana Fixed Fee | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| M&V Fixed Fee | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| WellPoint Fixed Fee | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |

Similarly, with respect to CLINs X003 for PMPM administrative costs, the following chart shows the average PMPM unit prices proposed by each offeror in comparison to the ICE for the PMPM prices:

| East Region | ICE | Health Net | Humana | M&V | WellPoint Medical |
|---|---|---|---|---|---|
| PMPM Average Unit Price | $8.81 | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| PMPM Total | $3.14 billion | [Redacted] | [Redacted] | [Redacted] | [Redacted] |

The Source Selection Evaluation Board reviewed the proposals and drafted a summary of its evaluations for the Source Selection Advisory Council and the Source Selection Authority. The Source Selection Evaluation Board did not conduct a comparative analysis or propose a source selection recommendation. The following table depicts the offerors' individual ratings for the factors and subfactors set forth in the solicitation, as assigned by the Source Selection Evaluation Board:

| Offeror | Technical Ratings-Technical/Management Risk Rating | | | | | | | Past Perfor- mance | Total Evalu- ated Price |
|---|---|---|---|---|---|---|---|---|---|
| | Subfactor 1 Network Manage- ment | Subfactor 2 Referral Manage- ment | Subfactor 3 Medical Manage- ment | Subfactor 4 Customer Service | Subfactor 5 Claims Processing | Subfactor 6 Program Planning & Control | Subfactor 7 Transition Manage- ment | | |
| HealthNet Federal Services | Outstanding Low | Outstanding Low | Good Low | Outstanding Low | Good Low | Acceptable Low | Acceptable Low | Satisfactory Confidence | $40,170, 839,651 |
| Humana Military Healthcare Services | Good Low | Outstanding Low | Good Low | Outstanding Low | Good Low | Good Low | Acceptable Low | Substantial Confidence | $40,517, 947,263 |
| M&V | Outstanding Low | Good Low | Outstanding Low | Good Low | Acceptable Low | Good Low | Acceptable Low | Limited Confidence | $43,073, 480,195 |
| WellPoint Military Care | Good Low | Outstanding Low | Good Low | Outstanding Low | Acceptable Low | Acceptable Low | Acceptable Mod | Satisfactory Confidence | $40,712, 000,000 |

After the Source Selection Evaluation Board completed its report, the Source Selection Advisory Council reviewed the documentation of the Source Selection Evaluation Board's evaluation to ensure that the Source Selection Evaluation Board had conducted a comprehensive review and evaluation of proposals in accordance with the evaluation criteria in Section M of the solicitation. The Source Selection Advisory Council determined that the Source Selection Evaluation Board complied with the evaluation criteria, and also conducted an analysis and comparison of the offerors' final proposals in order to make an award recommendation to the Source Selection Authority.

After reviewing the Source Selection Evaluation Board's technical, past performance, and price/cost evaluation consensus reports, the Source Selection Evaluation Board Chairperson's report, and the Source Selection Advisory Council's report and recommendation, the Source Selection Authority conducted an independent comparative assessment and trade-off analysis of the offerors' final proposals to reach an independent award decision for each region.

The Source Selection Authority's final evaluation resulted in the following findings concerning the East Region:

| Offeror | Technical Ratings-Technical Management Risk Ratings | | | | | | | Past Performance | Total Evaluated Price |
|---|---|---|---|---|---|---|---|---|---|
| | SF1 Network Management | SF2 Referral Management | SF3 Medical Management | SF4 Customer Service | SF5 Claims Processing | SF6 Program Planning & Control | SF7 Transition Management | | |
| Health Net Federal Services | Outstanding | Outstanding | Good | Outstanding | Good | Acceptable | Acceptable | Satisfactory Confidence | $40,170,839,651 |
| | Low | Low | Low | Low | Low | Low | Low | | |
| Humana Government Business | Good | Outstanding | Outstanding | Outstanding | Good | Good | Acceptable | Substantial Confidence | $40,517,947,263 |
| | Low | Low | Low | Low | Low | Low | Low | | |
| United Health Military & Veterans Services | Outstanding | Good | Outstanding | Good | Acceptable | Good | Acceptable | Satisfactory Confidence | $43,073,480,195 |
| | Low | Low | Low | Low | Low | Low | Low | | |
| WellPoint Military Care | Good | Outstanding | Good | Outstanding | Acceptable | Acceptable | Acceptable | Satisfactory Confidence | $40,712,000,000 |
| | Low | Low | Low | Low | Low | Low | Low | | |

The Source Selection Authority found that, with regard to the East Region contract, "Humana is the best value offeror." The Source Selection Authority's decision document explained that "Humana has the superior proposal in the non-price Factors." In finding that Humana's proposal represented the best value to DHA, the Source Selection Authority explained:

> Under Factor 1, Technical/Management, all offerors submitted strong proposals, and, as explained above, the degree of difference among the offerors was not dramatic. I determined that M&V ranked first in this Factor, with a slight advantage over both Humana and Health Net. I determine that Humana is ranked second for Factor 1, Health Net is ranked third, and WMC [Wellpoint] is ranked fourth.

> Under Factor 2, Past Performance, Humana has the clear advantage. For reasons explained above, the degree of distinction between Humana (rated Substantial Confidence) and M&V, WMC and Health Net (rated Satisfactory Confidence) was substantial. WMC is rated second in Factor 2. Between M&V and Health Net, I concluded that both were essentially equal in this Factor.

> Under Factor 3, Price, Health Net had the lowest Total Evaluated Price (TEP) ($40,170,839,651), followed by Humana ($40,517,947,263), followed by WMC ($40,712,000,000).   M&V proposed the highest TEP ($43,073,480,195).

> Under Factor 4, all offerors were rated acceptable.

> In making my decision I considered that, in accordance with RFP Section M.4, Factor 1, Technical/Management and Factor 2, Past Performance, are equal in importance, and individually, are more important than Factor 3,

Price/Cost. Further, when combined, Factors 1 and 2 are significantly more important than Factor 3, Price/Cost.

As to price, the Source Selection Authority found that the "P/CT Report documents a thorough analysis, including consideration of an Independent Cost Estimate (ICE) that fails to produce any findings that the prices proposed by the offerors are unreasonable." The Source Selection Authority concurred with the contracting officer's determination that the prices proposed by the offerors were reasonable and that no offeror's proposal included unbalanced pricing.

In the source selection decision document for the East Region contract, the Source Selection Authority recognized that "M&V did have a slightly better Factor 1 proposal than Humana," however, Factors 1 and 2 were equal in importance and Humana has a "significant Factor 2 advantage" that outweighed "M&V's slight advantage in Factor 1." Moreover, because Humana's proposal was determined to be the superior proposal in the non-price factors and Humana's total evaluated price was lower than M&V's total evaluated price, the Source Selection Authority concluded that a trade-off analysis was not necessary. The Source Selection Authority also concluded that a trade-off analysis was not required between Humana and WellPoint because Humana's proposal was superior for Factors 1 and 2 and Humana's total evaluated price was lower than Wellpoint's total evaluated price. Because Health Net's total evaluated price was lower than Humana's total evaluated price, the Source Selection Authority conducted a trade-off analysis and determined that "Humana's slight advantage in Factor 1 and significant advantage in Factor 2 significantly outweigh" the difference in price between Humana and Health Net's proposals. Based on the Source Selection Authority's analysis, as reflected in the source selection document, the Source Selection Authority ranked the offerors for the East Region "as Humana having the best value proposal, followed by Health Net, then [Wellpoint], and then M&V."

West Region Evaluation

The following table represents the offerors' final proposed prices for the West Region contract in comparison to the ICE:

| WEST Region: | Total Evaluated Price | Percent Difference from ICE |
|---|---|---|
| Health Net | $17,723,452,440.00 | -11.0% |
| Humana | $17,882,351,687.00 | -10.2% |
| M&V | $18,803,253,647.00 | -5.5% |
| | | |
| ICE: | $19,902,918,734.00 | |

As explained above, the total evaluated prices were affected in large part by the offerors' proposed Guaranteed Network Provider discounts (CLINs X001), as well as the proposed PMPM administrative costs (CLINs X003). Regarding CLINs X001 for underwritten healthcare costs, the following chart shows the Guaranteed Network Provider discounts proposed by each offeror and the projected impact on the total

underwritten healthcare costs for each option period:

| WEST Region | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| **Government-provided estimate underwritten healthcare costs (UHCC)** | $2,853,552,478 | $2,998,491,374 | $3,162,829,032 | $3,328,554,502 | $3,502,206,444 |
| **Health Net Proposed Discount** | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| **Health Net proposed UHCC** | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| **Humana Proposed Discount** | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| **Humana Proposed UHCC** | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| **M&V Proposed Discount** | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| **M&V Proposed UHCC** | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |

Offerors also proposed a fixed fee for the underwritten healthcare costs, contained in CLINs X002. The following table captures the offerors' proposed fixed fee as compared to the ICE fixed fee:

| WEST Region | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| **ICE Fixed Fee** | $42,803,287 | $44,977,371 | $47,442,435 | $49,928,318 | $52,533,097 |
| **Health Net Fixed Fee** | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| **Humana Fixed Fee** | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |
| **M&V Fixed Fee** | [Redacted] | [Redacted] | [Redacted] | [Redacted] | [Redacted] |

Similarly, with respect to CLINs X003 for PMPM administrative costs, the following chart shows the average PMPM unit prices proposed by each offeror in comparison to the ICE for the PMPM prices:

| West Region | ICE | Health Net | Humana | M&V |
|---|---|---|---|---|
| **PMPM Average Unit Price** | $9.89 | [Redacted] | [Redacted] | [Redacted] |
| **PMPM Total** | $1.72 billion | [Redacted] | [Redacted] | [Redacted] |

As with the East Region proposals, the Source Selection Evaluation Board reviewed the West Region proposals and drafted a summary of its evaluations for the Source Selection Advisory Council and the Source Selection Authority. The Source Selection Evaluation Board did not conduct a comparative analysis or propose a source selection recommendation. The following table depicts the offerors' individual ratings for the factors and subfactors set forth in the solicitation, as assigned by the Source Selection Evaluation Board:

| Offeror | Technical Ratings-Technical/Management Risk Rating | | | | | | | Past Perfor-mance | Total Evalu-ated Price |
|---|---|---|---|---|---|---|---|---|---|
| | Subfactor 1 | Subfactor 2 | Subfactor 3 | Subfactor 4 | Subfactor 5 | Subfactor 6 | Subfactor 7 | | |
| | Network Manage-ment | Referral Manage-ment | Medical Manage-ment | Customer Service | Claims Processing | Program Planning & Control | Transition Manage-ment | | |
| HealthNet Federal Services | Outstanding | Outstanding | Good | Outstanding | Good | Acceptable | Acceptable | Satisfactory Confidence | $17,723,452,440 |
| | Low | Low | Low | Low | Low | Low | Low | | |
| Humana Military Healthcare Services | Good | Outstanding | Purple | Outstanding | Good | Good | Acceptable | Substantial Confidence | $17,882,351,687 |
| | Low | Low | Low | Low | Low | Low | Low | | |
| United HealthCare Military and Veterans | Outstanding | Good | Outstanding | Good | Acceptable | Good | Acceptable | Satisfactory Confidence | $18,803,253,647 |
| | Low | Low | Low | Low | Low | Low | Low | | |

The Source Selection Advisory Council reviewed the Source Selection Evaluation Board's documentation and evaluation of the proposals to ensure that the Source Selection Evaluation Board had complied with the evaluation criteria in the solicitation. The Source Selection Advisory Council also analyzed and compared the proposals and made an award recommendation to the Source Selection Authority.

After reviewing the Source Selection Evaluation Board's technical, past performance, and price/cost evaluation consensus reports, the Source Selection Evaluation Board Chairperson's report, and the Source Selection Advisory Council's report and recommendation, the Source Selection Authority conducted an independent comparative assessment and trade-off analysis of the offerors' final proposals to reach an independent award decision.

The Source Selection Authority's final evaluation resulted in the following findings concerning the West Region:

| Offeror | Technical Ratings-Technical Management Risk Ratings | | | | | | | Past Perform-ance | Total Evaluated Price |
|---|---|---|---|---|---|---|---|---|---|
| | SF1 | SF2 | SF3 | SF4 | SF5 | SF6 | SF7 | | |
| | Network Management | Referral Management | Medical Management | Customer Service | Claims Processing | Program Planning & Control | Transition Management | | |
| **Health Net Federal Services** | Outstanding | Outstanding | Good | Outstanding | Good | Acceptable | Acceptable | Satisfactory Confidence | $17,723,452,440 |
| | Low | Low | Low | Low | Low | Low | Low | | |
| **Humana Government Business Inc.** | Good | Outstanding | Outstanding | Outstanding | Good | Good | Acceptable | Substantial Confidence | $17,882,351,687 |
| | Low | Low | Low | Low | Low | Low | Low | | |
| **United Health Military and Veterans** | Outstanding | Good | Outstanding | Good | Acceptable | Good | Acceptable | Satisfactory Confidence | $18,803,253,647 |
| | Low | Low | Low | Low | Low | Low | Low | | |

The Source Selection Authority determined that Humana's proposal represented the best overall value to DHA, however, the Source Selection Authority explained that, if Humana could not be awarded the contract because of the restrictions in the solicitation, then Health Net's proposal represented the next best overall value to DHA. In conducting the best value analysis, the Source Selection Authority explained:

> Under Factor 1, Technical/Management, all offerors submitted strong proposals, and, as explained above, the degree of difference among the offerors was not dramatic. I determined that M&V ranked first in this Factor, with a slight advantage over both Humana and Health Net. I further determined that Humana was ranked second in this Factor, followed by Health Net.

> Under Factor 2, Past Performance, ̣ [sic] Humana has the clear advantage. For reasons explained above, the degree of distinction between Humana (rated Substantial Confidence) and M&V and Health Net (rated Satisfactory Confidence) was substantial. Between M&V and Health Net, I concluded that both were essentially equal in this Factor.

> Under Factor 3, Price, Health Net had the lowest Total Evaluated Price (TEP) ($17,723,452,440), followed by Humana ($17,882,351,687). M&V proposed the highest TEP ($18,803,253,647).

> Under Factor 4, all offerors were rated acceptable.

> In making my decision I considered that, in accordance with the RFP, Factor 1, Technical/Management and Factor 2, Past Performance, are equal in

importance, and individually, are more important than Factor 3, Price/Cost.

The Source Selection Authority also found that the "P/CT Report documents a thorough analysis, including consideration of the Independent Cost Estimate (ICE) that fails to produce any findings that the prices proposed by the offerors are unreasonable." Accordingly, the Source Selection Authority concluded that the offerors' proposed prices were reasonable and did not include unbalanced pricing.

The Source Selection Authority concluded that Humana was the best value offeror because it "clearly demonstrated significantly better Past Performance" and proposed a price $920,901,960.00 less than M&V's proposed price. Thus, even though M&V had a "slightly better Factor 1 proposal than Humana," Factors 1 and 2 were equal in importance and Humana's significant past performance advantage outweighed M&V's slight advantage in Factor 1.

After finding that Humana was the best value offeror for the West Region contract, the Source Selection Authority conducted a trade-off analysis between M&V and Health Net:

> Between M&V and Health Net, M&V has a better Technical Proposal for Factor 1. As noted above, for Factor 2, both offerors were assessed the same Past Performance rating of Satisfactory Confidence and after consideration of all reports and information I determined that I cannot distinguish a meaningful difference between the past performance of M&V and Health Net. It is clear that M&V had documented difficulties in performance during the [Redacted] contract transition and OP1, but has improved performance in OP2 of the [Redacted] contract and is now performing satisfactorily. It is equally clear that there has been some decline in Health Net's performance over the span of their [Redacted] contract, however their performance remains satisfactory. They have also encountered difficulties in their [Redacted] contract, which is similar in scope, magnitude of effort, and complexities to this solicitation. Factors 1 and 2 are of equal importance in this evaluation. Therefore I find that the advantages in M&V's proposal for Factor 1, and lack of a meaningful difference between their past performance ratings give an advantage to M&V over Health Net in the non-price evaluation factors. However, even though Factors 1 and 2 are each more important than Factor 3, Price, I further find nothing in M&V's technical proposal which warrants the significantly higher price of M&V's offer at $1,079,801,207 over Health Net's offer.

The Source Selection Authority determined that, although M&V had an advantage over Health Net with regard to the non-price factors, M&V's technical advantage did not warrant the additional $1,079,801,207.00 in price. Indeed, the Source Selection Authority found that "nothing" in M&V's proposal "warrants the significantly higher price" of its offer. Accordingly, the Source Selection Authority ranked the offerors as Humana having the best value proposal, followed by Health Net, and then M&V.

The Source Selection Authority decision documents demonstrate that Humana's proposals for the East and West Region contracts offered the best overall value to the government in the East and West Regions. Due to the restrictions in the solicitation limiting an offeror to only one contract award, however, DHA awarded the East Region contract to Humana and the West Region contract to Health Net, as its proposal was found to represent the next-best value to the government. DHA notified the offerors of its award decisions on July 21, 2016.

Procedural History

M&V filed a bid protest at the GAO on August 1, 2016, after receiving a debriefing by DHA. WellPoint and Health Net also filed protests at the GAO that challenged DHA's award of the East Region contract to Humana. On October 19, 2016, the GAO held a hearing to address the bid protest. On November 9, 2016, the GAO issued its decision denying the protests of M&V, Health Net, and WellPoint. In its decision, the GAO agreed with M&V that the agency was required to perform a price realism analysis under the terms of the solicitation, specifically Section M.2.2. The GAO explained that this section of the solicitation "warned offerors that the agency 'may reject any proposal that is evaluated to be unrealistic in terms of program commitments, contract terms and conditions such that the proposal is deemed to reflect an inherent lack of competence or failure to comprehend the complexity and risks of the program.'" UnitedHealth Military & Veterans Servs., LLC, et al., B-411837.2 et al., 2016 WL 6821970, at *4. Citing previous GAO decisions, and without further discussion of the solicitation language, the GAO found that when "a solicitation puts offerors on notice that a procuring agency may reject proposals that are evaluated as being unrealistic, the agency's rejection of proposals is discretionary, but the realism evaluation is mandatory." Id. at *5. The GAO concluded:

> [S]ection M.2.2 provided that the agency would consider whether a proposal reflected a realistic understanding of the risks and complexities associated with program commitments and the contract's terms and conditions. Based on our review of the entire record, including the SSA's testimony that explained the extensive contemporaneous documentation supporting his conclusions, we conclude that the agency complied with the solicitation provisions regarding a realism assessment.

Id. at *6. The GAO denied the other protest grounds.

On November 17, 2016, M&V filed the above-captioned post-award bid protest in this court. The complaint, when filed, included two counts, but only Count I remains for this court to consider. Protestor withdrew Count II on January 27, 2017.[14]

---

[14] Count II of the complaint had alleged that procurement law and regulations require offerors to submit proposals that comply with solicitation instructions and requirements, and that Humana and Health Net submitted proposals that explicitly deviated from the solicitation's requirements. In a subsequent filing, protestor stated: "After reviewing the facts presented by Humana and Health Net in their briefs, UnitedHealth withdraws Count

Count I of the complaint, which is the only remaining count in the complaint, alleges that the solicitation contained a requirement that the agency assess the realism of program commitments and contract terms and conditions, but that the contemporaneous record is devoid of any evidence that the agency assessed the realism of the offerors' PMPM CLINs or Guaranteed Network Provider discounts.

M&V asks this court to declare that DHA's decision to award the "T-2017" contracts to Humana and Health Net lacked a rational basis and represented a clear and prejudicial violation of procurement regulations, to permanently enjoin DHA from proceeding with the contracts awarded under the solicitation to Humana and Health Net, and to order DHA to re-evaluate the proposals in accordance with the terms of the solicitation in order to make a new best value trade-off decision. Protestor argues that it is entitled to permanent injunctive relief because it can demonstrate success on the merits, it will be irreparably harmed by the loss of the opportunity to compete fairly for the contracts if injunctive relief is not granted, and public interest weighs in favor of injunctive relief. In response to the complaint, Humana and Health Net moved to intervene. After hearing from the parties, the court granted Humana and Health Net's motions to intervene. All parties have cross-moved for judgment on the administrative record. The parties do not dispute that this court has subject matter jurisdiction to consider the above-captioned bid protest and that M&V has standing to pursue this bid protest.

## DISCUSSION

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) (2016) governs motions for judgment on the administrative record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005))); see also Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001); see also Sys.

---

II of its Complaint, which alleged that Humana's and Health Net's proposals violated the Solicitation's stated requirements regarding network utilization." As a result of protestor's withdrawal, the court does not consider Count II of the complaint.

<u>Application & Techs., Inc. v. United States</u>, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. <u>See</u>, e.g., <u>Per Aarsleff A/S v. United States</u>, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (quoting <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), <u>see</u> 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'"); <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332); <u>Res. Conservation Grp., LLC v. United States</u>, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1329 (Fed. Cir. 2004) (citing <u>Scanwell Labs., Inc. v. Shaffer</u>, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the <u>Scanwell</u> line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332)); <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, <u>see</u> <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). <u>See</u> <u>Croman Corp. v. United States</u>, 724 F.3d 1357, 1363 (Fed. Cir. 2013) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting <u>Banknote Corp. of Am. v. United States</u>, 365 F.3d at 1350–51 (citing <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1057–58 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2000)), <u>aff'd</u>, 365 F.3d 1345 (Fed. Cir. 2004)))), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2013) (alterations in original). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2012);[15] <u>see also</u> <u>Tinton Falls Lodging Realty, LLC v.</u>

---

[15] The language of 5 U.S.C. § 706 provides in full:

To the extent necessary to decision and when presented, the reviewing

United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United

---

court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

    (1) compel agency action unlawfully withheld or unreasonably delayed; and

    (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

        (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

        (B) contrary to constitutional right, power, privilege, or immunity;

        (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

        (D) without observance of procedure required by law;

        (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

        (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (internal citations omitted); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure.") (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285–86); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme

Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) (internal citations omitted); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6–7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); BCPeabody Constr. Servs., Inc.

v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004), and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal withdrawn, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013); Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001), and superseded by regulation as recognized in MVS USA, Inc. v. United States, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the Federal Circuit:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368–69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

On a motion for judgment on the administrative record, a disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995–96; Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013). To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial.") ; Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation

omitted).   Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.   This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . .  To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. at 496 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

33

In this post-award bid protest, the parties dispute whether DHA's evaluation of the proposals was reasonable and in compliance with the terms of the solicitation. The issue in this bid protest is whether the solicitation required DHA to perform a price realism analysis, and, if so, whether such an analysis of the offerors' proposals was done by DHA. As explained further below, a price realism analysis considers whether an offeror's price is too low, such that it indicates a risk of poor performance and a lack of understanding of the solicitation requirements. See KWR Constr., Inc. v. United States, 124 Fed. Cl. 345, 356 (2015) ("Generally, a price realism analysis examines the performance risk of proposals in a fixed-price contract procurement, with particular attention to the risk of low-priced proposals. . . .") (internal citations removed). A price realism analysis differs from a price reasonableness analysis because a price reasonableness analysis considers whether an offeror's price is too high.[16] See Munilla Constr. Mgmt., LLC v. United States, 130 Fed. Cl. 635, 649 (2017) (explaining that an agency's concern in making a price reasonableness determination is whether the prices are too high, and a "determination of whether an offeror's prices are too low is made when an agency conducts a cost or price realism analysis"); see also EMTA Isaat, A.S. v. United States, 123 Fed. Cl. 330, 338 n.9 (2015) ("In general, a price reasonableness analysis has the goal of preventing the government from paying too much for contract work. A price realism analysis, on the other hand, investigates whether the contractor is proposing a price so low that performance of the contract will be threatened."). Price realism is not defined in the FAR. See Mil-Mar Century Corp. v. United States, 111 Fed. Cl. 508, 541 n.36 (2013).[17]

Judges of this court have found that, in a fixed-price procurement, an agency is required to perform a price realism analysis when the solicitation expressly provides that the agency will evaluate price realism or states that "[t]he Government may reject any proposal that is . . . unreasonably high or low in price when compared to Government estimates, such that the proposal is deemed to reflect an inherent lack of competence of [sic] failure to comprehend the complexity and risks of the program." ViON Corp. v. United States, 122 Fed. Cl. 559, 573 (2015) (emphasis removed) (finding that such language commits the agency to conducting a price realism analysis); see also EMTA Isaat, A.S. v. United States, 123 Fed. Cl. at 338 (explaining that there "is no dispute that the plain language of the RFP required the government to conduct a price realism analysis" when the solicitation provided that "[a]ll offerors['] proposed prices will be evaluated to ensure they are realistic, reasonable, and complete"); D & S Consultants, Inc. v. United States,

---

[16] FAR Part 15.404-1(a) requires a price reasonableness evaluation and provides that the "contracting officer is responsible for evaluating the reasonableness of the offered prices" in a negotiated procurement. 48 C.F.R. § 15.404-1(a)(1) (2017). The parties do not dispute that the agency considered price reasonableness.

[17] Unlike price realism, FAR 15.404-1(d) defines a cost realism analysis as "the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal." 48 C.F.R. § 15.404-1(d)(1).

101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x 558 (Fed. Cir. 2012) (explaining that the parties agreed that the solicitation required a price realism analysis because it stated "[t]he Government may evaluate the offeror's proposed labor rates to determine if the proposed rates are unrealistically low in order to assess the ability of the offeror to meet the PWS requirements and whether the proposal provides the Government with a high level of confidence of successful performance"). In Afghan American Army Services Corp. v. United States, another Judge on this court determined that an agency was required to conduct a price realism evaluation because the solicitation stated that the agency would "evaluate price proposals to determine whether the offered price reflects a sufficient understanding of the contract requirements and the risk inherent in the offeror's approach" and that proposals with "an unreasonable (high or low) price may be deemed to be unacceptable and may not receive further consideration." Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 357 (2009). Similarly, in Rotech Healthcare, Inc. v. United States, the court concluded that a price realism analysis was required because the solicitation stated that an "unrealistically low price may be grounds for eliminating a proposal." Rotech Healthcare, Inc. v. United States, 121 Fed. Cl. 387, 404 (2015), appeal dismissed (Fed. Cir. No. 15-5113 Nov. 13, 2015) (explaining that "the only reason any consideration of realism is necessary is the language in the RFP stating that unrealistically low offers may be eliminated").

In this post-award bid protest, protestor argues that DHA improperly failed to conduct a price realism analysis, and, therefore, violated the plain language of the solicitation. As a result of this failure, protestor argues that DHA's award decisions to Humana and Health Net were arbitrary and capricious and not in accordance with the law. Protestor points to the following language in Section M.2.2. of the solicitation: "The Government may reject any proposal that is evaluated to be unrealistic in terms of program commitments, contract terms and conditions such that the proposal is deemed to reflect an inherent lack of competence or failure to comprehend the complexity and risks of the program," as the solicitation term that allegedly required DHA to conduct a realism analysis of the offerors' proposed PMPM prices and Guaranteed Network Provider discounts. Protestor points to the term "unrealistic" in Section M.2.2. and asserts that "realism is the evaluation of an offeror's understanding through the lens of price and price elements." During oral argument, protestor's counsel argued that "the word 'realism' and 'unrealistic' means an evaluation of price." Protestor argues that, because the offerors' proposed PMPM prices and the Guaranteed Network Provider discounts were "contract terms" and Section M.2.2. of the solicitation explained that DHA "may reject any proposal that is evaluated to be unrealistic in terms of program commitments, contract terms and conditions," pursuant to the language of the solicitation, DHA was obligated to consider the realism of the offerors' proposed PMPM prices and Guaranteed Network Provider discounts. Protestor also asserts that the proposed level of effort associated with the PMPM prices represented the offerors' "program commitment" to perform the administrative services required by the solicitation, thus, DHA was required to consider the realism of the proposed levels of effort because it was a "program commitment."[18]

_____

[18] Protestor also argues that, to the extent the court finds the solicitation to be ambiguous, that ambiguity was latent and must be construed against DHA. Defendant and defendant-intervenors, however, argue that, if the court were to find the solicitation to be ambiguous,

Protestor asserts that an "evaluation of the offerors' technical proposals alone—without consideration of PMPM prices and guaranteed discounts—does not satisfy Section M.2.2.'s realism requirement." Protestor argues that "the plain language of Section M.2.2. obligated DHA to evaluate whether each offeror's PMPM prices and level of effort were realistic to accomplish the Administrative Services required under" the solicitation, and whether each offeror's Guaranteed Network Provider discount was realistic "and would allow the offeror to provide a network that meets the standards and produces best quality clinical outcomes for TRICARE beneficiaries."

Protestor also contends that the word "price" need not be expressly used in the solicitation in order to trigger a requirement to evaluate price realism. According to protestor, language in a solicitation indicating that a proposal may be rejected if it is "deemed to reflect an inherent lack of competence or failure to comprehend the complexity and risks of the program," is "classic realism language." Protestor asserts that, even if a solicitation does not expressly call for a price realism analysis, such an evaluation may be required when the "other classic indicia of price realism" are present. According to protestor, that Section M.2.2. stated that DHA "<u>may</u> reject any proposal that is evaluated to be unrealistic" did not give DHA discretion over whether to conduct an evaluation of realism. (emphasis added). To support its position, protestor relies on the decision in the bid protest regarding the awards at issue first filed by M&V at the GAO, <u>UnitedHealth Military & Veterans Services, LLC, et al.</u>, B-411837.2 et al., which found that Section M.2.2. required DHA to perform a price realism analysis, although that decision also found that the agency had met the requirements of performing a price realism analysis. Protestor also cites to previous decisions of this court that considered solicitation language which stated that an agency may reject proposals evaluated to be unrealistic, including <u>FCN, Inc. v. United States</u>, 115 Fed. Cl. 335, 376 (2014), and <u>ViON Corp. v. United States</u>, 122 Fed. Cl. 559, 564 (2015), which found that the government was required to evaluate price realism. Protestor asserts that in <u>FCN, Inc. v. United States</u>, "the RFP stated that 'unrealistically low offers **may** be considered unacceptable and rejected on that basis,'" and the court concluded that this language obligated the government to evaluate price realism. <u>FCN, Inc. v. United States</u>, 115 Fed. Cl. at 376 (emphasis in original). According to protestor, in <u>ViON Corp.</u>, the court found that the agency was required to conduct a price realism analysis when the solicitation "expressly provides that '[t]he Government *may* reject any proposal that is . . . unreasonably <u>high or low in price</u> when compared to Government estimates, such that the proposal is deemed

_____

then it was patently ambiguous and M&V has waived its ability to assert its interpretation, and, moreover, that extrinsic evidence demonstrates that the solicitation did not require a price realism analysis. Defendant and defendant-intervenors point out, citing protestor's question during the question and answer period prior to the submission of proposals, that protestor believed that the solicitation did not provide for a price realism evaluation. Defendant-intervenor Health Net argues that protestor's price realism interpretation "was conceived for the first time during the GAO bid protest process." Given the court's finding, however, it need not reach this issue.

to reflect an inherent lack of competence of [sic] failure to comprehend the complexity and risks of the program.'" (second emphasis added). Protestor, M&V, argues that "[t]he only difference" between the clause in ViON Corp. and "the one at issue here is that the clause in ViON [Corp.] refers to unreasonably high or low prices, while the clause here refers to unrealistic contract terms and program commitments." Protester contends that, because PMPM prices and Guaranteed Network Provider discounts are contract terms they should have been "subject to a realism evaluation under the plain terms of Section M.2.2."

Additionally, protestor argues that the location of Section M.2.2. within the solicitation is irrelevant. According to protestor, that Section M.2.2. is at the beginning of Section M of the solicitation and precedes the discussion of the price/cost factor evaluation criteria does not remove the obligation to conduct a price realism analysis. Protestor cites two GAO decisions: Logistics 2020 Inc., B-408543, 2013 WL 6235560, at *6 (Comp. Gen. Nov. 6, 2013) and B&B Medical Services, Inc., B-409705.4, 2015 WL 4480686, at *7 (Comp. Gen. June 29, 2015). Protestor contends that finding solicitation language to require a price realism analysis only when it is contained within certain sections of a solicitation would render Section M.2.2. superfluous and be inconsistent with the fundamental principle of interpretation that meaning must be given to all parts of a solicitation.

Protestor further asserts that, contrary to the conclusion in the GAO decision, there is no evidence in the contemporaneous administrative record that DHA conducted a required price realism evaluation. Although the GAO determined in UnitedHealth Military & Veterans Services, LLC, et al., B-411837.2 et al., that DHA, in fact, had conducted a realism evaluation, protestor contends that the administrative record "proves otherwise" and that this court should afford "no deference" to that part of the GAO decision. Protestor points out that neither the P/CT [price/cost team] reports, the technical evaluation team reports, nor the source selection decision documents assessed whether the offerors' proposed PMPM prices were realistic. Similarly, as with PMPM prices, protestor asserts that "the evaluation record is entirely devoid of any realism analysis of the offerors' proposed guaranteed network discounts."

Protestor argues that it was prejudiced by DHA's failure to evaluate price realism. According to protestor, "[h]ad DHA performed a realism analysis, it would have realized that the awardees' [for both the East and West Region contracts] PMPM prices and guaranteed discounts put the success of the contract[s] at risk, endangering DoD's ability to ensure high-quality, cost-effective care for military members and their families." Protestor explains that an awardee that proposes unrealistic prices and an inadequate level of effort for the PMPM CLINs puts the contract at risk because "all of the critical administrative services required under the contract" would be performed under these CLINs, including "building and maintaining a network to provide quality care to DoD personnel and their families; providing medical management to ensure that care is both high-quality and cost effective; processing claims in an accurate and timely manner; and providing other services to beneficiaries, providers, and the government." Protestor argues that Humana and Health Net proposed PMPM prices in the East and West regions that were [Redacted] and [Redacted] lower than the ICE, respectively, as opposed to

protestor's proposed PMPM prices which were higher than the ICE. With regard to the proposed Guaranteed Network Provider discounts, protestor states that the "TRICARE program already pays rates that are materially below commercial market rates, and guaranteed discounts under the RFP reduce those payments still further" such that "[d]eeper discounts and lower payments reduce the number of providers (and especially high-quality, in-demand providers) willing to join the network." As stated by protestor, as a result of deeper discounts and lower payments to providers, "[t]he network shrinks, quality of care suffers, and costs jump." Protestor alleges that Humana and Health Net proposed Guaranteed Network Provider discounts that exceeded the historical benchmark contained in the contemporaneous record, and "because DHA failed to evaluate the realism of the offerors' discounts, the agency never considered whether the awardees' proposed discounts were too aggressive and would result in adverse effects on the network and healthcare costs." Additionally, protestor argues that DHA "failed to assess the impact of the awardees' low underwritten healthcare cost fixed fees on the proposed discounts," and, thus, failed to account for the risk that "Humana and Health Net will be motivated to achieve their discounts, even if it means degrading quality of care and higher costs for the government and beneficiaries." Protestor states that "it proposed realistic PMPM prices and levels of effort, and discounts right in line with historical experience" such that "had DHA assessed the realism of the offerors' proposals as they stand, UnitedHealth would have been in a better position to win the East or West region awards."

In the alternative, protestor asserts the questionable and speculative argument that, had M&V known DHA would not conduct a price realism analysis, M&V "would have been more aggressive with its pricing, and leveraged its position as an insurer with a national presence" in order to propose a greater Guaranteed Network Provider discount and a lower underwritten healthcare fixed fee, which, according to protestor, would have resulted in a substantial chance of award to M&V. Why protestor would not have submitted its most competitive proposals in the first instance alludes the court. Moreover, protestor appears to suggest that it might have reduced its proposal prices just to get the contract award, even though, presumably, it had calculated the most appropriate offers pursuant to which it could properly meet the scopes of the work detailed in the contracts, when it submitted its proposals in response to the solicitation at issue.

In opposition, defendant and defendant-intervenors argue that the plain language of the solicitation did not require, "or permit," a price realism analysis and, to the extent a price realism analysis was required, the administrative record demonstrates that DHA's evaluation of the offerors' proposals satisfied any possible requirement to evaluate the realism of the proposed PMPM prices and Guaranteed Network Provider discounts.

Defendant explains that, although agencies are always required to perform a price reasonableness evaluation before awarding a contract under FAR § 15.402(a) (2017), the solicitation language determines whether an agency is required to evaluate proposals for price realism. Citing FAR § 15.404-1(d)(2), defendant asserts that, when evaluating proposals for a fixed-price contract, agencies are not always required to conduct a price realism analysis. According to defendant, "absent an express price realism provision" an agency only should perform a price realism evaluation on a fixed-price contract when the

solicitation "1) expressly states that the agency will review prices to determine whether they reflect a lack of technical understanding; and 2) states that a vendor/offeror's submission may be rejected on the basis of low prices." Defendant cites to the GAO's decision in <u>ERIMAX</u>, B-410682, 2015 WL 993532, at *4 (Comp. Gen. Jan. 22, 2015). Defendant argues that neither of the scenarios that would permit or require an agency to conduct a price realism evaluation are applicable to the "T-2017" procurement.

Defendant and defendant-intervenors also assert that protestor "attempts to read Section M.2.2. in isolation, rather than in the context of the rest of the evaluation criteria." Defendant and defendant-intervenors explain that Section M.2.2., which contained the language protestor relies upon to assert its price realism claim, preceded Sections M.3-M.10, which set forth the factors and subfactors that DHA was required to consider in its evaluation of the proposals, and DHA's evaluation was limited to those factors and subfactors. Defendant argues that Section M.2.2. did not create new factors or subfactors for DHA to employ. According to defendant, Section M.2.2. "simply gave DHA the discretion to immediately reject a proposal that was 'evaluated to be unrealistic in terms of program commitments, contract terms and conditions such that the proposal is deemed to reflect an inherent lack of competence or failure to comprehend the complexity and risks of the program'" based on the factors and subfactors specified in Sections M.3-M.10 of the solicitation.

To further support the argument that Section M.2.2. offered DHA a discretionary basis for rejection and did not impose a requirement to analyze price realism, defendant and defendant-intervenors assert also that Section M.2.2. did not include language such as "will," "shall," or "must," but provided a basis on which DHA "<u>may</u> reject any proposal that is evaluated to be unrealistic in terms of program commitments, contract terms and conditions." (emphasis added). According to defendant and defendant-intervenors, unlike Sections M.3-M.10, which employed terms such as "will evaluate" and "will perform," Section M.2.2. did not commit the agency to any additional evaluation requirements. Given that the solicitation used non-discretionary language throughout Section M, defendant argues that, if DHA intended to include a mandatory requirement in Section M.2.2., then it would have included mandatory language similar to other provisions of Section M.

With regard to the cases on which protestor relies to support its position, including <u>ViON Corp.</u> and <u>FCN. Inc.</u>, defendant and defendant-intervenors argue that the cases are distinguishable from the "T-2017" procurement. Defendant and defendant-intervenors assert that those cases discuss solicitations that expressly stated offerors' proposals could be rejected based on low prices, and Section M.2.2. in the solicitation now under review does not reference low prices. Additionally, defendant and defendant-intervenors argue that the cases on which protestor relies discussed solicitations in which the price realism requirement was included in the price factor, but the "T-2017" solicitation did not reference price realism in Section M.9, the price/cost factor.

Defendant and defendant-intervenors also argue that, even if the court were to determine that Section M.2.2. required DHA to evaluate the realism of the offerors' Guaranteed Network Provider discounts and PMPM prices, the administrative record

demonstrates that DHA's evaluation of the offerors' proposals satisfied that requirement. Defendant and defendant-intervenors assert that the nature and extent of a price realism evaluation is within the broad discretion of the agency. Defendant and defendant-intervenors argue that, according to the several hundred pages of evaluation and decision documents, the Source Selection Authority conducted an integrated assessment of the proposals and determined that the offerors understood the requirements of the solicitation and demonstrated their capability to satisfy the requirements. Defendant also argues that the price/cost evaluation team "effectively considered" the realism of the offerors' prices because the team compared the prices of the offerors against each other and against the ICE and found the prices to be in the "range of reasonableness" even though the prices were below the ICE.

Defendant and defendant-intervenors further argue that, even if the court were to find that DHA was required to conduct a price realism evaluation, and even if DHA did not do so, still protestor could not prevail in this bid protest because protestor has not demonstrated that it has suffered prejudice. Defendant and defendant-intervenors assert that, in order to sufficiently demonstrate prejudice, protestor must show that, if DHA had conducted the price realism evaluation there is a substantial chance that DHA would have found the other offerors' proposals to have lacked in competence and failed to comprehend the complexity and risks of the program. Defendant and defendant-intervenors contend that such a finding would be unlikely given that both Humana and Health Net are established healthcare companies that have satisfactory, or better, past performance records, both submitted strong technical proposals that demonstrated a clear understanding of the contract requirements, and both proposed comparable prices.[19] Defendant further argues that protestor has failed to demonstrate irreparable harm and that the public interest weighs against an injunction as it would result in delays to TRICARE program improvements designed to improve military readiness and the quality of healthcare for military members, retirees, and their families.

Although protestor asks this court to arrive at the same result that the GAO found in UnitedHealth Military & Veterans Services, LLC, et al., B-411837.2, et al., that a price realism analysis was required, this court has a different view. The GAO found that Section

---

[19] Because the court finds that a price realism analysis was not required, the court does not get to the issue of prejudice. Yet, the court notes that the basis for rejection is an "inherent lack of competence or failure to comprehend the complexity and risks of the program." Given the prior participation of both Humana and Health Net in the immediately previous "T-3" contracts, it is not surprising that DHA did not find Humana and Health Net to lack a basic understanding of the "program commitments, contract terms and conditions," including the complexity and risks of the program. Moreover, the outlying price proposals for both the East and West Region contracts were submitted by M&V, which submitted a price approximately two billion dollars higher than the awardee's price proposal for the East Region contract and approximately one billion dollars higher than the awardee's price proposal for the West Region contract. All of the other offerors submitted price proposals that were relatively close in value.

M.2.2. required DHA to perform a price realism analysis.[20] In its decision, the GAO explained "[w]e have held that where, as here, a solicitation puts offerors on notice that a procuring agency may reject proposals that are evaluated as being unrealistic, the agency's rejection of proposals is discretionary, but the realism evaluation is mandatory." UnitedHealth Military & Veterans Servs., LLC, et al., B-411837.2 et al., 2016 WL 6821970, at *5. Although the undersigned has high regard for the GAO and the quality of the decisions issued by the GAO, this court is not bound by decisions of the GAO. See CBY Design Builders v. United States, 105 Fed. Cl. 303, 341 (2012) (citing Centech Grp., Inc. v. United States, 554 F.3d 1029, 1038 n.4 (Fed. Cir. 2009) (GAO decisions are "not binding" authority, but may be "instructive in the area of bid protests.")). In finding that Section M.2.2. required a realism evaluation, the GAO decision did not explain its basis other than to cite to previous GAO decisions in which the GAO determined that such an evaluation is required when (1) the solicitation expressly states that the agency will review prices to determine whether they are so low that they reflect a lack of technical understanding, and (2) the solicitation states that a proposal can be rejected for offering low prices. See UnitedHealth Military & Veterans Servs., LLC, et al., B-411837.2 et al., 2016 WL 6821970, at *5 (citing [with no comment] Optex Sys., Inc., B-408591, 2013 WL 5946181, at *3; Esegur–Empresa de Seguranca, SA, B-407947 et al., 2013 WL 1898790, at *4 (Comp. Gen. Apr. 26, 2013); Waterfront Techs., Inc.-Protest and Costs, B-401948.16 et al., 2011 WL 2566578, at *15-16 (Comp. Gen. June 24, 2011)). In this bid protest, the solicitation did not state that the agency would review prices to determine whether they reflected a lack of understanding or that proposals could be rejected for offering low prices. In fact, notably absent from the plain language of Section M.2.2. is the word "price." As a result, offerors were not put on notice that their proposals would be evaluated for price realism. Given the GAO precedent discussed below, it appears that the GAO's decision in United Health Military & Veterans Services LLC, et al., B-411837.2 et al., takes a different approach than the majority of previous GAO decisions. Thus, it is not clear why the GAO concluded that Section M.2.2. required a price realism analysis and the court does not find the GAO's decision in UnitedHealth Military & Veterans Services, LLC, et al. persuasive.

The administrative record in this bid protest demonstrates DHA's extensive evaluation process and source selection methodology. As protestor asserts, agencies are required to evaluate proposals and make contract awards based on the criteria set forth in the solicitation. See NEQ, LLC v. United States, 88 Fed. Cl. 38, 47–48 (2009) ("It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."). It is equally well-established that agencies cannot evaluate proposals based on criteria that are not disclosed in the solicitation. See NVE, Inc. v. United States, 121 Fed. Cl. 169, 180 (2015). This court in Banknote Corp. of America, Inc. v. United States stated:

---

[20] As explained above, the GAO determined that DHA was required to consider price realism and that the agency adequately considered price realism. While asking the court to adhere to the GAO decision that a price realism analysis was required, protestor asks this court to afford "no deference" to the GAO's conclusion that DHA adequately considered price realism.

It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation. This requirement is firmly rooted in the Competition in Contracting Act (CICA) . . . which indicate[s] that an agency shall evaluate competitive proposals and assess their qualities solely on the factors and subfactors specified in the solicitation. See 10 U.S.C. §§ 2305(a)(2)(A), 2305(a)(3)(A) (2000) . . . . It thus is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals, Acra, Inc. v. United States, 44 Fed. Cl. 288, 293 (1999), and, where appropriate, must disclose the factors' relative importance, Isratex, Inc. v. United States, 25 Cl. Ct. 223, 230 (1992). See also Cube Corp. v. United States, 46 Fed. Cl. 368, 377 (2000); Dubinsky v. United States, 43 Fed. Cl. 243, 266 (1999). That said, an agency still has "great discretion in determining the scope of an evaluation factor." Forestry Surveys and Data v. United States, 44 Fed. Cl. 493, 499 (1999). Consistent with these precepts, in a case such as this, a protester must show that: (i) the procuring agency used a significantly different basis in evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error.

***

[I]t is well-settled that "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." Analytical & Research Tech., Inc. v. United States, 39 Fed. Cl. 34, 45 (1997)[.]

Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 386-87 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004) (footnote and other citations omitted); see also NVE, Inc. v. United States, 121 Fed. Cl. at 180; Transatlantic Lines, LLC. v. United States, 122 Fed. Cl. 624, 632 (2015); FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 388 (2011) ("It is a fundamental principle of procurement law that an agency must conduct its best-value analysis using the evaluation factors and subfactors specified in the solicitation." (citing 48 C.F.R. § 15.101–1(b)(1) (2011); 48 C.F.R. § 15.305(a) (2011); Acra, Inc. v. United States, 44 Fed. Cl. 288, 293 (1999))); PlanetSpace, Inc. v. United States, 92 Fed. Cl. at 536-37; NEQ, LLC v. United States, 88 Fed. Cl. at 47-48; PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 13-14 (2006).

In accordance with the well-established principle that an agency must evaluate proposals in accordance with the solicitation terms, it is improper for an agency to conduct a price realism analysis in a fixed-price procurement when the solicitation does not expressly or implicitly require a price realism analysis because such an analysis would employ unstated evaluation criteria. See NVE, Inc. v. United States, 121 Fed. Cl. at 180; see also Ceres Envtl. Servs., Inc. v. United States, 97 Fed. Cl. 277, 306 (2011) ("In situations where the solicitation does not expressly or implicitly require a price realism analysis, it is improper for an agency to conduct a price realism analysis and then reject a proposal for having an unrealistically low price."); DMS All-Star Joint Venture v. United

States, 90 Fed. Cl. at 663 n.11 ("A price realism analysis is analysis to determine if the offeror's proposed prices are *unrealistically low*." (emphasis in original) (internal citations removed)); Munilla Constr. Mgmt., LLC v. United States, 130 Fed. Cl. at 649 ("Nothing in the Solicitation indicates the Navy would assess price as a proxy for determining an offeror's understanding of contract requirements and nothing otherwise committed the Navy to a realism analysis."); Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 356. Generally, when an award of a fixed-price contract is contemplated, "a proposal's price realism is not ordinarily considered, since a fixed-price contract places the risk" of loss on the contractor. See Acad. Facilities Mgmt. v. United States, 87 Fed. Cl. 441, 466 (2009) (citing FAR 15.404–1). Absent instruction from the solicitation, an agency is not required, or permitted, to consider realism in a fixed-price contract because "the fixed price task order puts the risk of underpriced offers on the contractor." Rotech Healthcare, Inc. v. United States, 121 Fed. Cl. at 404; see also Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. at 356. In a fixed-price procurement, when the solicitation does not expressly or implicitly state that a price realism analysis would be conducted, and the agency conducts a price realism analysis, an offeror can challenge the analysis as "arbitrary, capricious, or an abuse of discretion" because the agency would have relied upon undisclosed evaluation criteria in making its award. See NVE, Inc. v. United States, 121 Fed. Cl. at 180; see also Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. at 386.

In the above-captioned bid protest, if, in the solicitation, DHA had committed itself to evaluating the realism of the offerors' proposed PMPM prices and Guaranteed Network Provider discounts, then DHA would have been required to perform a price realism evaluation. Conversely, if the solicitation did not require a price realism analysis, then DHA was not permitted to evaluate the realism of the offerors' prices, including the proposed PMPM prices and Guaranteed Network Provider discounts. Thus, in this post-award bid protest, the court is tasked with determining whether the solicitation, specifically Section M.2.2., required DHA to evaluate the realism of the offerors' proposed PMPM prices and Guaranteed Network Provider discounts. To make this determination, the court looks to the plain language of the solicitation, specifically Section M.2.2. See Per Aarsleff A/S v. United States, 829 F.3d at 1309 (explaining that, when the interpretation of a term in a solicitation is contested, the court should begin with the plain language of the document); see also Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353 (holding that "[i]nterpretation of the solicitation is a question of law over which we exercise independent review. . . . We begin with the plain language of the document"); Fulcra Worldwide, LLC v. United States, 97 Fed. Cl. 523, 538-39 (2011) ("Interpretation of the solicitation begins with the plain language of the document."); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 708 (explaining that the "well-settled principles of contract interpretation . . . apply with equal force to the interpretation of government solicitations" and "require the court to begin with the plain language of an agency's solicitation"). In interpreting the meaning of a solicitation term, the court must consider the solicitation as a whole, "interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." See Per Aarsleff A/S v. United States, 829 F.3d at 1309 (citing Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353); see also Fulcra Worldwide, LLC v. United States, 97 Fed. Cl. at 538 (explaining that context defines the meaning of any given term or provision in a government solicitation).

43

As set forth above, Section M.2.2. of the solicitation stated:

**M.2.2. Unrealistic Proposals.** The Government may reject any proposal that is evaluated to be unrealistic in terms of program commitments, contract terms and conditions such that the proposal is deemed to reflect an inherent lack of competence or failure to comprehend the complexity and risks of the program.

The plain language of the solicitation at issue does not further define the specific "program commitments, contract terms and conditions" that DHA could find to be unrealistic in an offeror's proposal, but the language does describe the conditions upon which the agency can reject a proposal. During oral argument, protestor argued that "contract terms and conditions, by its plain terms, includes price" because "[t]he price is a term of the proposal which then becomes a term of the contract." To the extent protestor is arguing that price is an essential contract term, the court rejects the contention that any reference in a solicitation to evaluating the realism of contract terms would necessitate a price realism analysis. Although an agency may implicitly commit to conducting a price realism analysis in certain instances, the mere reference to the realism of contract terms is insufficient to trigger the detailed and in-depth analysis required in a price realism evaluation.

Although, in addition to <u>ViON Corp. v. United States</u> and <u>FCN, Inc. v. United States</u>, protestor also cites the following cases to support its position that DHA was required to conduct a price realism analysis, each of these cases is distinct from the above-captioned bid protest, and not helpful to protestor: <u>Erinys Iraq Ltd. v. United States</u>, 78 Fed. Cl. 518, 531 (2007), in which the court explained that the solicitation expressly required a "Price Realism Analysis" that would "be a separate review and evaluation of the proposed price to determine the degree to which an offeror proposed realistic prices"; <u>Dyncorp Int'l LLC</u>, B-407762.3, 2013 WL 3475184, at *8 (Comp. Gen. June 7, 2013), in which the GAO found that the solicitation did not require a price realism analysis because nothing in the solicitation stated that the agency planned to evaluate proposed <u>prices</u> to determine whether they were so low that they reflected a lack of technical understanding, and nothing in the solicitation stated that the agency could reject a proposal for offering unrealistically low prices; <u>NJVC, LLC</u>, B-410035, 2014 WL 5358430, at * 9 (Comp. Gen. Oct. 15, 2014), in which the GAO concluded that absent a clear indication in the RFP that <u>price</u> would be considered in assessing technical understanding or performance risk under the technical and management factors, the agency was neither required to nor permitted to consider an offeror's price under these factors; <u>Sci. Applications Int'l Corp.</u>, B-407105, 2012 WL 5521341, at *8 (Comp. Gen. Nov. 1, 2012), in which the GAO found that the solicitation effectively provided for a price realism evaluation when it indicated that the agency would evaluate <u>price proposals</u> to determine whether proposed <u>prices</u> were compatible with the scope of effort, were not unbalanced, and were neither excessive nor insufficient for the effort to be accomplished, and that this may be grounds for eliminating a proposal from competition on the basis that the offeror does not understand the requirement; <u>Flight Safety Servs. Corp.</u>, B-403831, 2010 WL 5241433, at *4 (Comp. Gen. Dec. 9, 2010), in which the GAO found that, although the solicitation did

not state that offerors' prices would be evaluated for realism, it effectively provided for such an evaluation when it established that the Air Force could reject a proposal if the offeror's low price reflected an inherent lack of competence or failure to comprehend the complexity and risks of the program. In each of these cases, when a price realism analysis was required, the solicitation explicitly referred to "price" or "rates."   As noted above, Section M.2.2. does not include the word "price."

As these cases explain, this court has previously concluded that an agency is committed to conducting a price realism analysis when the solicitation provides that "[t]he Government may reject any proposal that is . . .  unreasonably high or low in price when compared to Government estimates, such that the proposal is deemed to reflect an inherent lack of competence [or] failure to comprehend the complexity and risks of the program." ViON Corp. v. United States, 122 Fed. Cl. at 573.[21] Similarly, the GAO has explained:

> [E]ven where a solicitation does not expressly require a price realism evaluation, we will conclude that such an evaluation is required where (1) the RFP expressly states that the agency will review prices to determine whether they are so low that they reflect a lack of technical understanding, and (2) the RFP states that a proposal can be rejected for offering low prices.

Optex Sys., Inc., B-408591, 2013 WL 5946181, at *3 (Comp. Gen. Oct. 30, 2013) (finding that the agency was required to consider price realism because the solicitation included price language similar to that quoted above) (emphasis added). Although protestor cites to Dyncorp International LLC, B-407762.3, 2012 WL 3475184, and NJVC, LLC, B-410035, 2014 WL 5358430, for support, in these cases, the GAO reached a conclusion adverse to protestor's current argument. In Dyncorp International LLC, B-407762.3, the GAO found that the solicitation did not require a price realism analysis because nothing in the solicitation stated that the agency planned to evaluate proposed prices to determine whether they were so low that they reflected a lack of technical understanding, or that the agency could reject a proposal for offering unrealistically low prices. Also, in NJVC, LLC, B-410035, the GAO concluded that absent a clear indication in the solicitation that price would be considered in assessing technical understanding or performance risk under the technical and management factors, the agency was neither required to, nor permitted to, consider the technical and management factors through the lens of price.

The current post-award bid protest is similar to the facts in Dyncorp International LLC, B-407762.3, and NJVC, LLC, B-410035, and distinguishable from the other cases cited by protestor and on which protestor relies, because the solicitations at issue in all of those cases contemplate a price realism analysis, and Section M.2.2. does not. As

---

[21] Also, in SecureNet Co. Ltd. v. United States, 72 Fed. Cl. 800, 812-13 (2006), the court found that a solicitation did not call for a price realism evaluation when the only reference to price realism in the solicitation was "defined in terms of whether the offer is too high, rather than too low."

discussed above, Section M.2.2. does not state that the agency will review prices to determine whether an offeror understands the technical requirements or that a proposal can be rejected for offering a low price, and, in fact, M.2.2. does not refer to high or low prices at all. Instead, Section M.2.2. states that DHA could reject a proposal that was unrealistic in terms of program commitments, contract terms, and conditions. That Section M.2.2. explains that a proposal could be rejected if its program commitments, contract terms, and conditions are found to "reflect an inherent lack of competence or failure to comprehend the complexity and risks of the program," is not sufficient to establish, under the factors identified in ViON Corp. v. United States, that DHA was implicitly committed to conducting a price realism analysis. Thus, protestor's argument that Section M.2.2. required a price realism analysis fails to pass the test that protestor itself puts forth to support this bid protest.

Additionally, when Section M.2.2. is read in the context of Section M in its entirety, protestor's argument is unpersuasive. As explained above, Sections M.3-M.10 set forth, in detail, the evaluation factors and subfactors that DHA would use to evaluate the proposals, and DHA was required to follow the evaluation criteria set forth in conducting its evaluation. Immediately following Section M.2.2. in the solicitation was Section M.2.3., which obligated DHA to evaluate whether the proposals demonstrated the offerors' understanding of the requirements, as well as the ability to fulfill the requirements, of the solicitation. In contrast to Section M.2.2., which stated that "[t]he Government may reject any proposal," Section M.2.3. stated that "[t]he Government will evaluate the extent to which the proposal exhibits a clear understanding of the work requirements and the means required to fulfill the requirements." (emphasis added). When read together, Sections M.2.2. and M.2.3. required DHA to evaluate whether proposals exhibited a clear understanding of the work requirements and an ability to meet those requirements, and granted DHA the discretion to reject a proposal that presented unrealistic "program commitments, contract terms and conditions" such that the proposal reflected a "lack of competence or failure to comprehend the complexity and risks of the program." Additionally, as defendant and defendant-intervenors highlight, Section M.9 of the solicitation specifically explained in what context DHA would evaluate "FACTOR 3, PRICE/COST" of each proposal. Within Section M.9, Section M.9.4. indicated that "[t]he Government will perform a cost realism analysis/most probable cost evaluation, in accordance with FAR 15.404-1(d), on the Offeror's proposed CLIN 9001 Transition-Out, estimated cost."[22] In Section M.9.6. the solicitation explained that "[t]he Government will evaluate the Offeror's TEP [total evaluated price] for reasonableness. Line items will also

---

[22] A cost realism analysis, which is defined in FAR 15.404-1(d), is distinct from a price realism analysis, "a term not employed in the FAR." DMS All-Star Joint Venture v. United States, 90 Fed. Cl. at 662-63 (explaining that "[c]ost realism is a technique that is applied to cost-reimbursement contracts" and price realism "examines the performance risk of proposals in a fixed-price contract procurement, with particular attention to the risk of low-priced proposals, and may include the cost realism analysis references in FAR 15.404-1(d)").

be reviewed for unbalanced pricing." Section M.9 did not include price realism language.[23]

The plain language of Section M.2.2. explains its purpose and meaning, which was to grant DHA the authority to reject any proposals that the agency considered unrealistic due to "an inherent lack of competence or failure to comprehend" the program commitments, contract terms, and other conditions including the complexity and risks of the program, in light of the evaluation factors and subfactors delineated in Sections M.3-M.10. There is no requirement in Section M.2.2. for DHA to make a positive or negative finding as to the realism of the proposed PMPM prices and Guaranteed Network Provider discounts. Instead, the phrase "may reject" afforded DHA discretion to reject a proposal determined to be unrealistic based on the evaluation criteria described in the solicitation. See Mil-Mar Century Corp. v. United States, 111 Fed. Cl. at 542 (holding that an agency was not required to perform a realism analysis because the solicitation stated that the agency "may reject" a proposal that reflected a lack of realism). The solicitation did not, as protestor asserts, create an obligation to evaluate price realism.

Based on an independent reading of the plain language of the solicitation, the court concludes that the solicitation did not require DHA to conduct a price realism analysis. Because the solicitation did not require a price realism analysis, DHA was not permitted to evaluate the realism of the offerors' proposed prices because, if DHA had conducted a price realism analysis, it would have relied on unstated evaluation criteria.   Because protestor's price realism argument is its sole, remaining protest ground, protestor's challenge of DHA's decisions to award the East and West Region TRICARE contracts to Humana and Health Net fails.

**CONCLUSION**

For the reasons stated above, protestor's motion for judgment on the administrative record is **DENIED**. Defendant and defendant-intervenors' cross-motions for judgment on the administrative record are **GRANTED**. Having failed to succeed on the merits, protestor's request for declaratory and injunctive relief is **DENIED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[23] Additionally, as discussed above, Section L of the solicitation directed offerors to propose their PMPM prices and Guaranteed Network Provider discounts in their price proposals, and offerors were instructed not to address their price proposals in their technical proposals. Thus, the solicitation contemplated a clear separation between the evaluation of the technical and price proposals.